**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CR-40005-TSH |
| GEORGE FENZELL, | ) | |
| Defendant. | ) | |
| | ) | |

## <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

## <u>INTRODUCTION</u>

The United States of America, by and through the undersigned attorneys, submits this sentencing memorandum regarding Defendant George Fenzell.

To his credit, Defendant George Fenzell has accepted responsibility for his actions by pleading guilty, and seeks to move on with his life. He pleaded guilty and admitted guilt to Count Two, tax evasion, as charged in the Indictment. In addition, he provided the Government with substantial assistance in its investigation of another tax challenged individual – by submitting to interviews and by testifying before a federal grand jury. The Court should take these facts into account when sentencing the defendant.

Yet the seriousness of his crimes, and the prolonged period over which he committed his crimes, commands, we respectfully suggest, a term of incarceration. This case does not involve an isolated instance of tax fraud. It does not involve a brief lapse in judgment, or a mistake for which defendant claims his personality traits and disorders

were susceptible.  It does not involve tax fraud in just one year or two, although that would be bad enough.

Rather, this case involves at least twelve (12) years of tax fraud – despite repeated warnings along the way that should have turned Defendant Fenzell away from crime and into compliance.   In 2000, defendant embarked on a decade long campaign to obstruct and thwart the IRS's ability to determine his income and taxes, and to evade his taxes. With the assistance of convicted tax fraud promoters and tax defying protesters William Dion, Catherine Floyd, and Charles Adams, see United States v. William Dion, et al. No. 09-cr-40027-FDS (promoter case against Dion, Floyd, Adams, Gary and Scott Alcock, and the Thoricks resulting in convictions and prison sentences after trial), Fenzell decided to take his dental practice underground and to hide his income from both federal and state tax authorities.

He did so using not just one tax fraud tool, but several tools and layers of concealment.  He created dummy companies controlled on paper by other individuals and entities in order to receive his dental practice receipts and to make it appear as if other individuals owned and controlled his dental practice.   PSR ¶ 9-10.  He closed up his own bank accounts and started to use sophisticated "warehouse," or commingled bank accounts to deposit his dental practice income to make it virtually impossible to trace.  Id. ¶ 9, 11.  He used his office manager to help him cash thousands of dollars in checks to minimize any paper trail back to the IRS.  See id. ¶ 12; Ex. 1 (Girard MOI).  He used a nominee payroll service to further make his dental practice disappear.  He used multiple additional dummy companies and trusts to hide other assets – including New Hampshire real estate, a Lincoln Navigator automobile, and a Ducati motorcycle.  E.g., Ex. 2.

12816975.1

In short, defendant employed an elaborate scheme to hide his income and his financial affairs, and did so over a very long period of time.

Defendant did all of this even after he was warned, early on, of what he already knew – that he was committing federal offenses and could be investigated.   He was given numerous opportunities, multiple "forks in the road," to make the right choice, and to come into compliance.  He was given an opportunity to get right with the law – but he continued down the path he had chosen.

When the Dion-Floyd-Adams promoters were investigated, he learned of search warrants executed against their residence in 2004.  Instead of leaving their services and getting right with the law, defendant continued in his tax evasion.  In fact, he stayed with Dion's services.   The Dion promoters explained to him that they would simply change warehouse bank accounts – to Calico Management – which defendant continued to use through 2008, receiving cash deliveries wrapped in aluminum foil from the Calico account.  Ex. 3 ¶  (Thorick MOI, explaining use of Calico account).

But that was not the end of the warnings.   In 2007, the Massachusetts Department of Revenue found a lead on his income despite his extraordinary efforts to conceal it. Rather than taking this warning and getting right with both Massachusetts and the IRS, defendant embarked on five more years of tax fraud, through 2012 – when he was finally caught by the IRS by search warrant executed at this business.   In 2007, rather than hire a local accountant, he went across the country, to Nevada, to hire a tax fraud-promoting CPA to keep the Massachusetts DOR at bay – and to come up with a new plan to hide his income.  He moved his dental practice from the Dion dummy companies to new dummy companies that WR set up for him, with bank accounts in Florida.  He routed his business

income from Worcester to those nominee accounts in the names of dummy companies in Florida, and even used his mother as the account signer to help aid and abet his fraud. He continued to use those accounts, and continued to hide his assets and income from the IRS, over the ensuing five years. If it were not for the IRS search warrant, it is likely that defendant would still be hiding his annual income, and the hundreds of thousands of dollars he had accumulated and hid in those Florida dummy companies away from the IRS.

Not only that, but after filing his late 2000 through 2005 returns in 2007 with the help of WR, he stopped filing returns again. Defendant Fenzell knew, from Massachusetts DOR correspondence, that they had only found leads on his 2000 through 2005 income. See Ex. 4 (Mass DOR complaint). Accordingly, he filed those returns, dealt with Massachusetts, but put his assets beyond the reach of IRS collection through the use of new dummy companies. Those same dummy companies helped him stay off the radar for the 2008 through 2011 tax years – which the defendant took advantage of by not filing and not paying tax during those years – until he was caught in May 2012 by IRS search warrant.

His final warning came, in October 2007, several months after he hired WR from Nevada, when he was subpoenaed to testify before a federal grand jury in Massachusetts investigating the Dion promoters. He was invited to interview prior to grand jury and to provide information. Exs. 5, 6 (MOIs from 2007 investigation contact with Fenzell). Not only did he not provide information, not only did he not cooperate at a time when he could have provided even more assistance like others have done to bring the Dion promoters to justice (Dion, et al, have already been convicted and have been sentenced),

4

defendant continued in his tax evasion for five more years even though he knew federal prosecutors and IRS criminal investigation were investigating the matter.

Defendant Fenzell even filed two false and fraudulent tax returns, for 2006 and 2007, in 2009, substantially underreporting his receipts – after all of these warnings.  PSR ¶ 15.

Finally, the record shows that the defendant helped facilitate attempted tax fraud committed by friends and associates.  Defendant acted as a nominee for his friends' dummy companies, including a fellow dentist who also used WR dummy companies.  Ex. 7 (document showing bill for real estate owned by dentist Kotler in the name of "George Ferrell," a variation on Fenzell's name for which he had a fake driver's license, which Fenzell allowed him to use to hide Kotler's ownership in real estate).  He also helped a friend of the Fenzell's family, RS, hide ownership of a Cape Cod restaurant by pretending to be president when in fact he had no role whatsoever.  Ex. 8 (entity paperwork for La Scala restaurant showing Fenzell listed as nominee officer); Ex. 9 ¶ 34 (witness statement by RS stating Fenzell had no stake in business).

Whatever defendant and his medical expert want to say about his social and psychological short comings that made him susceptible to trusting others, such medical history has little if any role here given the lengths and extent to which defendant Fenzell went to commit tax fraud in the face of repeated warnings.  He is smart and highly educated.  He knew what he was doing was wrong.  He was told what he was doing was wrong but he continued – until he was caught.  He spent the better part of his adult life in compliance, before 2000, when he had the same psychological and social issues he now

5

claims. It was therefore not those issues that led him to cheat and lie on tax returns. Rather, it was greed, pure and simple.

Given the nature and circumstances of his serious offenses, and given the crucial need for deterrence in tax evasion cases, some term of imprisonment is necessary here. George Fenzell's community, and every honest taxpaying citizen of the United States, has to know that a successful self-employed, highly educated dentist like George Fenzell who cheats on his taxes to the serious, substantial, and prolonged degree that he did will pay a heavy price and will go to federal prison.

The Sentencing Guideline calculation calls for a term of imprisonment of between 30 and 37 months. Upon considering defendant's substantial assistance to the Government for which the Government will move pursuant to U.S.S.G. § 5K1.l, and taking into account the Court's previous sentencings in the Dion, et al., related cases, as well as all sentencing factors pursuant to 18 U.S.C. § 3553(a), the Government respectfully recommends that Defendant George Fenzell be sentenced to a 24-month term of imprisonment, and pay restitution in the amount of $210,344.

## ARGUMENT

Under the law, sentencing begins with a properly calculated advisory Sentencing Guidelines range. Gall v. United States, 128 S.Ct. 586, 596 (2007). The Guidelines continue to be a robust component of federal sentencing law, and judicial fact-finding in the calculation of the appropriate advisory Guideline range is a necessary part of the sentencing process. United States v. Grier, 475 F.3d 556 (3d Cir. 2007) (en banc).

The applicable Guidelines range and policy statements "seek to embody the § 3553(a) considerations," and "it is fair to assume that the Guidelines, insofar as

12816975.1

practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Rita v. United States, 551 U.S. 338, 348–349 (2007).

After calculating the Guideline range, the Court must consider that range along with all the factors listed in 18 U.S.C. § 3553 before arriving at the final sentence.   Any factual findings in the sentencing must meet the preponderance of the evidence standard. See United States v. Leahy, 473 F.3d 401, 413 (1st Cir. 2006).

## I.   THE SENTENCING GUIDELINES

### A.   The PSR's Guideline Calculation

The PSR calculates the total offense level as 19, resulting in a recommended term of imprisonment of between 30 and 37 months.   The PSR's calculation is as follows:

(1) The base offense level is 20 because the tax loss caused by the defendant was $459,501.   According to the Tax Table in the Guidelines, any loss between $400,000 and $1,000,000 results in a starting base offense level of 20. U.S.S.G. §§ 2T1.1, 2T4.1.

(2) Because the defendant used sophisticated means to perpetrate his tax evasion (through the use of multiple nominees, "warehouse" bank accounts, and multiple layers of concealment), a two-level enhancement is added to the base offense level for a total of 22.   U.S.S.G. § 2T1.1(b)(2).

(3) Because the defendant timely accepted responsibility by pleading guilty before the government expended resources preparing for trial, defendant is entitled to a three-level reduction in the offense level.   U.S.S.G. § 3E1.1(a), (b).

The Total Offense Level is therefore **19.**

Defendant does not oppose the sophisticated means enhancement, recognizing that his conduct falls well within the Guideline definition.   See U.S.S.G. § 2T1.1 (Advisory Note 5).   The defendant does challenge the tax loss calculation and the resulting base offense level.   As set forth below, from a Guideline calculation

7

perspective, defendant's arguments are without merit, but may be considered pursuant to 18 U.S.C. § 3553(a).

### B. Tax Loss

The PSR calculates the total tax loss at $459,501.   This figure includes $421,307 of federal tax loss, and $38,194 of state tax loss.  Defendant challenges these figures on four grounds.

First, defendant asserts that the tax loss resulting from defendant's tax evasion for the 2008 through 2011 tax years should be excluded because, in his words, "Mr. Fenzell filed and fully paid $164,837.00 in federal taxes for these years prior to being charged in this case," and such payments represent his good faith efforts to make amends for his conduct.  Def.'s Mem. at 9.  But as the defendant himself recognizes, tax loss is based on intended loss and is not reduced by restitutionary payments after he is caught.  See U.S.S.G. § 2T1.1 (c) ("the tax loss is the total amount of loss that was the object of the offense.") (emphasis added), Note 5 ("The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense.").

Unmentioned by the defendant is the fact that he only paid back the 2008 through 2011 taxes that he evaded <u>after</u> he was caught holding the proverbial bag; it was only after a search warrant was executed by federal agents against his business in May 2012, and after completion of the crimes, that he made restitutionary payments back to the Treasury.  Prior to that point, he had accumulated approximately $450,000 in savings hidden away in dummy companies with Florida bank accounts which he could have used to pay his taxes in full years before.   Exs. 10,11 (2012 bank statements showing balances).  Only after the search warrant did he begin to make payments back, knowing

12816975.1

that he was caught and would be prosecuted – demonstrating just how easy it was to pay outstanding tax liabilities and how his claimed reliance on a Nevada accountant to handle the matter is without merit.  Accordingly, his intended tax loss should not be reduced by his payments subsequent to the commission of the offense.

Second, defendant claims that the forthcoming Sentencing Guidelines taking effect in November 2015 modify the Tax Table to account for inflation over the years which would place defendant's tax loss in a range resulting in a base offense level of 18, not 20 as under the current Guidelines.  But as the defendant must recognize, the 2015 Guidelines have not taken effect.  The Guidelines to be applied are the Guidelines in effect at the time of sentencing.  The Guidelines in effect are in fact the 2014 Guidelines, and defendant's tax loss over $400,000 results in a base level offense of 20, not 18.

Third, defendant challenges the inclusion of the state tax losses in the calculation, contending that the Government never asserted those amounts.  Def.'s Mem. at 8.  The government merely disclosed those amounts in our possession after prompted by an inquiry by the Court's probation officer.  The Government would concur, however, that the $38,194 in state tax losses should be reduced by $20,745, for a total of $17,000 in state tax loss, due to the adjustment for the year 2000.

Fourth, finally, and related to point two above, defendant argues that even under the current Sentencing Guidelines and the current Tax Table, an adjustment must be made for inflation.   The table is based on the value of the dollar in 2001.  If defendant's $421,307 federal tax loss is adjusted for inflation to reflect 2001 dollars, the real tax loss is only $392,617, which results in a base offense level of 18.  Def.'s Mem. at 7.

12816975.1

This argument is more appropriate under section 3553(a) than in determining the proper Sentencing Guideline calculation.   The table and the attendant tax loss calculation dictate the offense level.  Defendant's loss is over $400,000, resulting in an offense level 20.   Even with the inflation adjustment, defendant's intended tax harm was substantial and fairly close to the $400,000 level.  If the remaining state tax loss is included, the resulting calculation still brings the total over $400,000.

In any event, the Government concurs that the Court should consider an inflation factor under section 3553(a) to determine in the overall mix whether the Guidelines appropriately capture the degree of defendant's criminal culpability.   The Government suggests that the inflation adjustment has a small impact when weighing defendant's overall culpability and assessing the nature and circumstances of the offense under section 3553(a).

## C.  Advisory Guideline Range

The Government agrees with the Sentencing Guideline calculation determined in the PSR which is 19.  This results in a recommended term of imprisonment between 30 and 37 months.

## D.  Substantial Assistance

As set forth in a separately-filed motion, the Government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure in defendant's Sentencing Guideline calculation as a result of his substantial assistance.   As explained in the separately-filed motion, defendant provided substantial assistance by submitting to three separate interviews with Government counsel, by providing information helpful in the civil litigation brought by The Department of Justice to enjoin WR from preparing tax returns,

12816975.1

and by testifying in a grand jury investigation.  Thus, the Government recommends that the Guideline range be reduced to 24 months of imprisonment pursuant to U.S.S.G. § 5K1.1.

## II.      18 U.S.C. § 3553(a)

In addition to the Sentencing Guidelines, the Court must also consider all sentencing factors enumerated in 18 U.S.C. § 3553(a).  Section 3553 sets out the factors to be considered in imposing a sentence which include, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter; and (3) the need to avoid unwarranted sentencing disparities.

### A.      Nature and Circumstances of the Offense

Consideration of all the Section 3553 factors, including the nature and circumstances of the offense and the history and characteristics of this Defendant, indicate that a prison sentence of 24 months is appropriate here.  A few points bear mentioning and repeating.

Defendant Fenzell's crimes were serious.  He caused a substantial tax harm to the United States of approximately $400,000 even with an inflation adjustment.   He perpetrated his crimes over more than a decade.  As noted in the introduction, his crimes were not isolated mistakes reflecting bad judgment on just an occasion or two.  He was

given warnings along the way that should have brought him into compliance. When a search warrant was conducted against the Dion group in 2004, he continued working with them anyway, and continued to hide and conceal his income from the IRS in sophisticated ways. When the Massachusetts DOR contacted him in 2007, he simply switched promoters, set up new entities and nominees to hide assets and income, and continued his tax fraud for another five years until he was finally caught by a search warrant in May 2012. Along the way, he willfully filed false tax returns as well.

All of this should be weighed along with Defendant Fenzell's acceptance of responsibility, and his substantial assistance to the Government as previously discussed.

### 1. Defendant's Claim That He Relied on An Accountant And Tried to Get Compliant After 2007 Is Without Merit

In mitigation of his culpability, defendant tells a story going forward from May 2007 that is not accurate. Defendant contends that when the Massachusetts DOR contacted him in 2007 about his unfiled and unpaid taxes for 2000 through 2005, he wanted to get compliant and was introduced to WR. WR, we are told, successfully resolved some of Fenzell's DOR issues and, thus, Fenzell trusted him. WR set up new structures for him that he allegedly thought were legal, although he knew the new structures were helping him evade collection of tax. WR assured him everything was under control. Fenzell trusted and believed in WR, until agents raided his practice. Def.'s Mem. at 18-19.

To begin, it is very clear what defendant should have done when faced with repeated warnings up to and including 2007 with the Massachusetts DOR notices: hire a reputable and local accountant (if not attorney) and get fully compliant at that juncture.

12816975.1

Instead, defendant went across the country to find yet another tax fraud promoter to help him hide his assets and income once again.

Importantly, the fraud that WR was selling him was the same fraud promoted by Dion and that Fenzell knew was the subject of a criminal investigation; the set up and use of dummy, sham companies to make it look on paper as if others controlled his practice when in fact he did.   This was not some new, novel technique that was even plausibly legal.   It was the same method of hiding his income taught by the Dion group, and defendant knew it.

It is further inconceivable that defendant trusted Reeves in good faith to help him pay back outstanding liabilities, for five long years, while Fenzell collected hundreds of thousands of dollars in nominee accounts hidden away from the IRS in Florida without demanding some sort of plan with the IRS to make good on outstanding debt.   Five long years with no plan and no payments.   The truth is that defendant had no intention of paying so long as the IRS never found the hundreds of thousands of dollars sitting in his Florida accounts.

Further undermining defendant's claim is the fact that he deliberately and willfully went off the proverbial grid after 2007 when he stopped filing tax returns yet again, for 2008 through 2011.  In 2007, he finally filed his late 2000 through 2005 returns (the only returns he knew were the subject of a DOR investigation – IRS had not found his income as of yet and he had received no notices from the IRS), but he did not pay the tax.   He argues that he did not pay because Reeves was going to work out a payment plan with the IRS.

13

When raided, defendant readily began paying money right over to the IRS, demonstrating that his argument on that score is without merit.  His decision to stop filing again, for 2008 through 2011, shows that the intent behind using the WR dummy companies with Florida accounts was not only to conceal his cash assets from collection, but to hide his future income after setting up the companies in 2007.

Defendant had in his possession all the tax information he needed to have his returns prepared, e.g., Ex. 12 ("Tax Crap" file for 2011), and all the money he needed to pay the back taxes. Exs 10, 11.  But he deliberately failed on both scores because he did not want to pay and did not want to file, hoping, with the new WR structures, he had successfully hidden his practice and its income once again.

Finally, in 2009, defendant filed 2006 and 2007 returns, late, only after he received IRS notices for these years.  Defendant filed false and fraudulent returns for these years, substantially underreporting his receipts, even after all of these warnings and even after he was supposedly trusting WR to get him right with the IRS.  See PSR ¶ 15. The fact that he knowingly and willfully filed false returns with the help of WR undermines any claim that he relied upon and trusted WR.

Accordingly, the WR period, 2007 through 2012, should be seen for what it was; not misguided trust by a socially awkward dentist, but the continuation of willful and deliberate tax evasion by the defendant until he was caught by an IRS raid.  How quickly this defendant began paying thereafter – demonstrating how easy it was, demonstrating exactly what he should have done years before.

12816975.1

2.   **Defendant's Claim Of Psychological Defects and Social Awkwardness in Mitigation of Culpability is Without Merit**

Relying upon a statement from a specialist in the psychology, defendant contends that his social deficiencies and awkwardness, his tendency toward anxiety and depression, a "cloudiness" in some thought processes while under stress, his tendency to misunderstand or suspect the motives of others, and his tendency to be unduly influenced by others provide "context" for his criminal actions and mitigate them to some extent. Def.'s Mem. at 15-17.

It does not appear that defendant's expert understands the full "context" in which defendant committed these crimes.  To begin, defendant was a highly educated and skilled grown adult when he began committing these offenses, not a child.  Prior to 2000, he spent the better part of his adult life in compliance with the law even with all of these alleged psychological and social deficiencies.  They provide no excuse for what he himself chose to do beginning in 2000.

In 2000, defendant's motives and intent were clear:  greed and anti-IRS animus.[1] As he himself admitted, Defendant Fenzell wanted to cheat on his taxes to save money which led him to the Dion tax fraud promoters.   If the defendant were susceptible to undue influence by and trusting in others, he should have been unduly influenced by a reputable attorneys and accountants who would have told him what he was doing was illegal.  Instead, he deliberately chose the Dion group, with all his intellect and education, because he wanted cheat on his taxes and save money.  They convinced him he would not

---

[1]    Defendant's anti-tax and anti-IRS animus is demonstrated, in part, by the tax files he kept in folders labelled "Tax Crap."  Ex. 12-16.

12816975.1

get caught given the sophisticated means with which they would help him hide his practice and income.  But he did get caught.

Defendant was warned about the execution of a federal search warrant and a criminal investigation against the Dion group in 2004 but still he kept with the program to conceal his income.  In 2007, he was warned again by a Massachusetts DOR investigation, but he decided to hire another tax fraud promoter from Nevada to set up new structures and new methods of concealment – and proceeded to evade taxes for another five years.   He also filed false tax returns which he knew were untrue.   All of this he did by his own choice.  There is nothing in defendant's expert report that excuses twelve years of cheating and deception that he knew to be wrong – and in the face of repeated warning signs.

Sadly, many taxpayers suffer from anxiety and depression.   Many people suffer from social phobias and social awkwardness.   Many more people grow up in far poorer and deprived circumstances than this defendant who was raised by two parents, including a veterinarian father, and who attended private schools and ultimately Tufts University. But honest forthright people who suffer from all this do not engage in a decade-long campaign of tax evasion.   Defendant's circumstances are no excuse.  He was a highly educated adult when he made these choices – after he spent years in compliance and knowing what the law was.  The Court should not be swayed by the defendant's claim that his background and conditions mitigate his conduct and should result in a reduced sentence.

The Sentencing Guidelines advise that mental and emotional conditions are "not ordinarily relevant in determining whether a departure is warranted, except as provided in

Chapter Five, Part K, Subpart 2." U.S.S.G. § 5H1.3. Nothing in Part K would provide an exception here.

### B.       Family Circumstances

Defendant seeks a sentence of home confinement based, in part, on his alleged role as an essential caretaker for his four-year old son and his elderly mother. Neither circumstance justifies a variance in this case. Children, regrettably, are almost always the victim of a parent's criminal misdeeds. It is not the Court's sentence that will cause disruption in defendant's son's life; it is the defendant's criminal conduct.

Indeed, as a preliminary matter, the Government notes that the health of defendant's son did not stop Fenzell from committing federal offenses. Even after he was born, defendant continued with his tax evasion. Even a new born son and the risk of a father going to prison did not stop the defendant from his crimes against the United States.

In any event, any collateral harm here can and will be mitigated during the 24-month prison term the Government is seeking. Fenzell's family is more fortunate than most. Defendant's girlfriend, the child's mother, is the primary caregiver and is gainfully employed. The Fenzells receive substantial financial assistance and support from the state in order to care for their son. The child was evaluated and diagnosed by the public school system at taxpayer expense. He has been getting treatment in an Individualized Education Program and attends public elementary school five days a week in the mornings. He also attends a Flex Center program for further support. And he receives yet more support through occupational and speech therapy three times per week. Fenzell and his current girlfriend are presently seeking even more assistance from the state; they

12816975.1

are trying to have the Douglas school system pay for in home services they believe are necessary for further support. Def.'s Mem. at 25.

None of this is administered by the defendant. Defendant has a "strong bond" with his son we are told. He provides some care giving support by getting up with his son, helping him get dressed and feeding him, dropping him off at school in the morning before he goes to work, and picks him up twice a week. No one questions that defendant is a good and loving father and that his son benefits from his presence. The inconvenience and sadness a term of incarceration will cause defendant's family is regrettable. But there is nothing in these circumstances that place this case beyond the heartland of cases, beyond the typical inconvenience and trauma brought to families by a family member's criminal conduct. In the words of the Guidelines:

> The fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

U.S.S.G. § 5H1.6. Defendant's family members are available to pick up the slack while defendant is paying his debt to society. The primary inconvenience appears to be the need to get their son to school early in the mornings. Even if family members will not or cannot help, alternative arrangements can and will be made to ensure her son gets to school in the morning, even if it is inconvenient and even if it requires some additional financial hardship. Defendant, in the words of the Guidelines, is not "irreplaceable" to serve this function.

As for the care he gives his elderly mother, defendant avers that he helps administer her medication and that, without his assistance, she is prone to take the wrong medication, or to take the medication improperly. To begin, Ms. Fenzell aided and

12816975.1

abetted her son's tax fraud by helping him hide his money in accounts in Florida that she controlled.  She was not cooperative when agents contacted her.  See Ex. 17.   This in no way detracts from the care she deserves, but the Guidelines dictate it is a factor to consider.  U.S.S.G. § 5H1.6 (Application Note 1(A)).   In addition, defendant is not the only person that can help her administer her medication properly.  In-laws and cousins mentioned in their submission are surely available to help implement the medications prescribed by physicians.   Ms. Fenzell is no doubt a beneficiary of Medicare giving her treatment and care that will ensure her well-being.   Again, simple inconvenience and the need to change protocols and schedules is an insufficient basis for departure under this Guideline – especially given the seriousness of the offense and the need for a prison term in this case to deter others from tax evasion.

Accordingly, this case does not present with family circumstances outside the heartland of cases that would require a reduction in sentence.

**C.**      **The Need For Deterrence**

The section 3553(a) factors include: the need for the sentence to afford adequate deterrence, the need for the sentence to reflect the seriousness of the offense, the need to promote respect for the law, and the need to provide just punishment. 18 U.S.C. 3553(a); United States v. Bras, 483 F.3d 103, 106 (D.C. Cir. 2007) (emphasis added).

As the introductory comment to the tax section of the Sentencing Guidelines state:

The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be

commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1.

Indeed, sentences consistent with the Sentencing Guidelines in tax cases are critical to deterring would-be tax cheats and necessary to keep our system of revenue collection intact. The tax system in the United States relies, to a large extent, on the truthful self-reporting of our citizens. For taxpayers to be motivated to pay their fair share and file truthful returns, they need to believe that everyone else is paying their fair share and filing truthful returns. For the system to be effective, taxpayers need to believe that their neighbors, friends and co-workers are also being truthful and paying what they owe. And, equally important, honest taxpayers need to believe and see that there are substantial consequences for not paying taxes.

Deterrence is a primary consideration in criminal tax cases and, we respectfully suggest, compels that George Fenzell to serve a term of imprisonment. See United States v. Ture, 450 F.3d 352, 357 (8th Cir. 2006) ("Because of the limited number of criminal tax prosecutions relative to the estimated incidences of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."). See also United States v. Baucom, 486 F.3d 822, 830 (4th Cir. 2007).

George Fenzell caused at least a $400,000 tax harm to the United States. As a self-employed dentist, he attempted to conceal substantial income in numerous ways. He failed to pay substantial federal and state taxes. He did so for twelve (12) years.

12816975.1

Understanding that the Defendant Fenzell deserves credit for taking responsibility and for assisting the Government, the public must nevertheless know that when people cheat on their taxes to the extent George Fenzell did, they will pay a heavy price, including time in federal prison. Thus, some term of imprisonment is necessary to achieve the need for deterrence.

### D.   Unwarranted Sentencing Disparities

Section 3553(a) emphasizes that similarly-situated defendants be sentenced consistently. The Court's previous sentences in the Dion-related cases suggest a term of imprisonment here. The promoters received, 7 years, 5 years, and 4 years, respectively. A Dion-related sentence that is particularly on point is the sentence imposed in United States v. Gary Alcock, 09-cr-40027-FDS (D. Mass.). Alcock, like Defendant Fenzell, was a client of the Dion promoters and used their services to conceal his income and evade taxes. Unlike Fenzell, Alcock cooperated early and provided substantial assistance by testifying at the trial of the promoters. Unlike Fenzell, he used only one promoter (the Dion group), not an additional promoter after being warned and investigated. Alcock, like Fenzell, argued mental deficiencies at sentencing in mitigation of his conduct. But the Court sentenced Alcock to 14 months in prison notwithstanding his full acceptance of responsibility and his substantial assistance. His brother, Kenneth Scott Alcock, who had far lower tax loss and who also provided substantial assistance, was sentenced to one year in prison.

These sentences suggest a substantial term of imprisonment here. While Defendant Fenzell has accepted responsibility for his actions, assisted the Government in a separate investigation, and did not engage in wholesale promotion of multiple tax fraud

12816975.1

schemes, his crimes were nevertheless serious.  The tax harm he caused was substantial.

He assisted others in hiding their assets.  The period over which he engaged in criminal

conduct was over ten long years.  While a reduction in sentence is warranted, some term

of imprisonment is necessary to avoid fundamental unfairness to others similarly-situated

who have been sentenced.

### III.  RESTITUTION

The Court may impose an order of restitution pursuant to 18 U.S.C. § 3663

because the parties agreed pursuant to the plea agreement that the defendant would agree

to a restitution order.  Reasonable estimates of restitution are permitted.  United States v.

Salas-Fernandez, 620 F.3d 45, 48 (1st Cir. 2011) (in determining amount of restitution, "a

sentencing court is not held to a standard of absolute precision. . . . A 'modicum of

reliable evidence' will suffice.") (citations omitted); see also United States v. Milstein,

481 F.3d 132, 137 (2d Cir. 2007) (court affirmed restitution order — "Here, the District

Court, acting within its broad discretion to determine restitution, properly employed this

measure, and, based on the evidence before it, made a reasonable estimate of the amount

of lost sales."); cf. United States v. Catoggio, 326 F.3d 323, 329 (2d Cir. 2003)

(remanding on restitution calculation issue in part where "the district court made no

indication that the $80 million figure was an estimate of actual loss.") (citing United

States v. Futrell, 209 F.3d 1286, 1292 (11th Cir. 2000) (restitution could be based on

reasonable estimate of losses when it would be impossible to determine the precise

amount)).

12816975.1

The amount of restitution the Government seeks is $210,344.  This is based on the agreed upon taxes due and owing, minus the amounts Defendant Fenzell has already paid.  According to IRS records, that amount is $210,344.

## CONCLUSION

For the foregoing reasons, the Government agrees with the findings and recommendations of the Presentence Report, and respectfully suggests that the Court impose a sentence in this matter that includes a 24-month term of imprisonment.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney


By:    */s/ John N. Kane, Jr.*
JOHN N. KANE, JR.
Assistant Chief
U.S. Department of Justice
Tax Division

Dated: June 24, 2015

12816975.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

*/s/ John N. Kane, Jr.*
JOHN N. KANE, JR.
Assistant Chief
U.S. Department of Justice, Tax Division

12816975.1